IN THE SUPREME COURT OF NORTH CAROLINA

2022-NCSC-53

No. 191A21

Filed 6 May 2022

IN THE MATTER OF: K.Q.

Appeal pursuant to N.C.G.S. § 7B-1001(a1)(1) from order entered on 3 March 2021 by Judge Cheri Siler Mack in District Court, Cumberland County. This matter was calendared in the Supreme Court on 18 March 2022 but determined on the record and briefs without oral argument pursuant to Rule 30(f) of the North Carolina Rules of Appellate Procedure.

*Patrick A. Kuchyt for petitioner-appellee Cumberland County Department of Social Services.*

*Matthew D. Wunsche for Guardian ad Litem.*

*Mary McCullers Reece for respondent-appellant father.*

HUDSON, Justice.

Respondent-father appeals from the trial court's order terminating his parental rights to his minor child K.Q. (Kenny).[1] Upon review, we affirm the trial court's order.[2]

---

[1] A pseudonym is used to protect the identity of the juvenile and for ease of reading.

[2] The order also terminated the parental rights of Kenny's mother. The mother noticed an appeal from the termination order and a prior order ceasing reunification efforts, but her appeal was dismissed by order of this Court on 14 September 2021. Accordingly, this opinion concerns only respondent-father's appeal.

## I.    Background

On 8 June 2018, Cumberland County Department of Social Services (DSS) filed a juvenile petition alleging four-year-old Kenny was neglected and dependent. The petition provided that DSS received a Child Protective Services (CPS) referral on 5 April 2018 concerning Kenny's safety after law enforcement was called to the parents' residence on 23 March 2018 in response to a physical altercation between the parents in Kenny's presence. The mother told law enforcement that respondent-father came at her with a knife and cut her, swung a baseball bat at her, threw her on the floor, and held her so she could not leave. Respondent-father was charged with assault on a female as a result of the incident.

DSS further alleged, and the record shows, that the mother filed a complaint and request for a domestic violence protective order (DVPO) based on the 23 March 2018 incident on 26 March 2018; respondent-father was arrested on 31 March 2018 for violating the DVPO; but the action was dismissed and the DVPO was dissolved on 13 April 2018 because the mother failed to appear in court and prosecute. Since that time, social workers had attempted home visits, left notices at the residence, and sent a certified letter to the parents informing them of the CPS report and requesting the parents contact the social workers. However, the social workers' efforts to confirm Kenny's wellbeing were unsuccessful. DSS reported that when a social worker went to the residence with law enforcement on 7 June 2018, respondent-father was present

and "became belligerent and yelled and cursed at the social worker." Respondent-father told the social worker that the mother had left and was in Charlotte, but he would not provide an address or phone number for the mother. DSS ultimately alleged in the petition that it believed the parents were living together; the mother had not contacted DSS; the social worker had not been able to see Kenny to determine his safety; Kenny was at risk of irreparable harm in the parents' custody; and DSS could not ensure his safety.

¶ 4      On the same day the petition was filed, the trial court entered an order granting DSS nonsecure custody of Kenny. However, Kenny was not immediately turned over to DSS because his and his mother's whereabouts were unknown. Kenny had still not been turned over to DSS when the matter came on for hearing on the need for continued nonsecure custody on 13 June 2018. Respondent-father appeared at the hearing and testified about the parents' CPS history and previous DVPOs in Mecklenburg County; but he denied the allegations in the instant petition, testified he did not want to turn Kenny over to DSS, and refused to provide the location of Kenny and the mother. The court continued the hearing until the following afternoon and ordered respondent-father to either produce Kenny by that time or reveal Kenny's exact location so DSS could take custody by that time. Kenny was turned over to DSS on 14 June 2018.

¶ 5      Respondent-father was initially allowed weekly supervised visitation with

Kenny while DSS's nonsecure custody of Kenny continued. However, on 16 July 2018, DSS filed a "Motion for Review" seeking to cease respondent-father's visitation and contact with Kenny based on allegations that respondent-father had brought a knife to visitation; he became belligerent with the supervising social worker when the social worker ceased the visit due to his insistence on discussing the case in front of Kenny; he grabbed Kenny's arm after the visit had ceased; and he had to be escorted from the building by security. DSS also reported in the motion that respondent-father had left threatening messages for the mother and threatened to abscond with Kenny if the opportunity arose. The trial court immediately suspended respondent-father's visitation pending a full review hearing and prohibited contact with Kenny. Following a hearing on 20 August 2018, the trial court granted DSS's motion and ordered that respondent-father's visitation remain suspended until Kenny's therapist recommended that visitation resume. The court also ordered respondent-father to complete parenting and anger management classes.

¶ 6 Following an adjudication hearing on the juvenile petition on 29 and 30 November 2018, the trial court adjudicated Kenny neglected and dependent.[3] In support of the adjudication, the trial court made findings about the long history of domestic violence between the parents, including findings about the 23 March 2018

---

[3] The trial court entered an "Adjudication and Temporary Disposition Order" on 7 January 2019. A "Corrected Adjudication and Temporary Disposition Order" was later entered on 17 April 2019. This opinion relies on the corrected order.

domestic violence incident and DSS's ensuing intervention that were consistent with the allegations in the petition. The court also found that respondent-father had blamed Kenny for the mother's injuries from the 23 March 2018 incident and had told the mother to tell the court the same.

¶ 7          The matter came back before the trial court for the dispositional portion of the hearing on 12 February 2019. In a disposition order entered on 11 April 2019, the court found that respondent-father was attending counseling and anger management classes and had reported completing a psychological evaluation. The court also found that it had informed respondent-father of the need for continued compliance with his case plan. The court further found and concluded that Kenny's return to respondent-father custody at that time would be contrary to Kenny's health and safety, and that respondent-father was not a fit or proper person for the care, custody, and control of Kenny or for visitation until a therapeutic recommendation. Accordingly, the court ordered DSS to retain custody of Kenny. Respondent-father was ordered to complete age-appropriate parenting classes, participate in individual counseling, complete the Resolve Program to address domestic violence issues, complete a psychological evaluation, and maintain stable housing and employment. Respondent-father was not allowed visitation until it was recommended by Kenny's therapist.

¶ 8          At the initial permanency planning hearing on 11 April 2019, the trial court established a primary plan of reunification with the parents with a secondary plan of

custody with a suitable person concurrent with adoption. However, following a permanency planning on 1 August 2019, the court changed the permanent plan for Kenny to adoption with secondary plans of custody with a suitable person and reunification with respondent-father. Then, following a permanency planning hearing on 12 December 2019, the court entered an order finding that despite respondent-father's participation in services, he continued to desire a relationship with the mother; DSS and the guardian ad litem were concerned that domestic violence remained an issue despite his participation in services; the mother had obtained a new DVPO against respondent-father on 29 October 2019; and respondent-father had new criminal charges related to the mother. The court ordered DSS to proceed with filing a termination of parental rights action in pursuit of Kenny's primary permanent plan.

¶ 9 On 2 June 2020, DSS filed a motion to terminate respondent-father's parental rights on grounds of neglect pursuant to N.C.G.S. § 7B-1111(a)(1) (2021), willful failure to make reasonable progress pursuant to N.C.G.S. § 7B-1111(a)(2) (2021), and willful abandonment pursuant to N.C.G.S. § 7B-1111(a)(7) (2021). The termination motion was heard on 25 September and 6 October 2020. On 3 March 2021, the trial court entered an order terminating respondent-father's parental rights. The court concluded that grounds existed to terminate respondent-father's parental rights for neglect and willful failure to make reasonable progress, *see* N.C.G.S. § 7B-1111(a)(1)–

(2), and that termination of his parental rights was in Kenny's best interests. Respondent-father appealed.

## II. Analysis

Respondent-father challenges the trial court's adjudication of the existence of grounds to terminate his parental rights.

> When reviewing the trial court's adjudication of grounds for termination, we examine whether the court's findings of fact are supported by clear, cogent and convincing evidence and whether the findings support the conclusions of law. Any unchallenged findings are deemed supported by competent evidence and are binding on appeal. The trial court's conclusions of law are reviewed de novo.

*In re Z.G.J.*, 378 N.C. 500, 2021-NCSC-102, ¶ 24 (cleaned up). "[A]n adjudication of any single ground in N.C.G.S. § 7B-1111(a) is sufficient to support a termination of parental rights." *In re E.H.P.*, 372 N.C. 388, 395 (2019).

A trial court may terminate parental rights for neglect pursuant to N.C.G.S. § 7B-1111(a)(1) if it determines the parent has neglected the juvenile within the meaning of N.C.G.S. § 7B-101. N.C.G.S. § 7B-1111(a)(1). A neglected juvenile is defined, in relevant part, as "[a]ny juvenile less than 18 years of age . . . whose parent, guardian, custodian, or caretaker . . . does not provide proper care, supervision, or discipline" or "[c]reates or allows to be created a living environment that is injurious to the juvenile's welfare." N.C.G.S. § 7B-101(15)(a), (e) (2021).

> Termination of parental rights based upon this statutory ground requires a showing of neglect at the time of the

termination hearing or, if the child has been separated
from the parent for a long period of time, there must be a
showing of a likelihood of future neglect by the parent.
When determining whether such future neglect is likely,
the district court must consider evidence of changed
circumstances occurring between the period of past neglect
and the time of the termination hearing.

*In re R.L.D.*, 375 N.C. 838, 841 (2020) (cleaned up). "[E]vidence of changed conditions

must be considered in light of the history of neglect by the parents and the probability

of a repetition of neglect." *In re O.W.D.A.*, 375 N.C. 645, 648 (2020). "The

determinative factors must be the best interests of the child and the fitness of the

parent to care for the child *at the time of the termination proceeding*." *In re Z.G.J.*,

378 N.C. 500, 2021-NCSC-102, ¶ 26 (quoting *In re Ballard*, 311 N.C. 708, 715 (1984)).

¶ 12        Here the trial court found that Kenny was previously adjudicated neglected

due to domestic violence between the parents and determined there was a likelihood

of a repetition of neglect if Kenny was returned to respondent-father's care.

¶ 13        On appeal, respondent-father asserts he substantially completed the services

required by his case plan and contends the trial court erred in determining that there

was a likelihood of repetition of neglect. He asserts the trial court's determination of

a likelihood of repetition of neglect "hinged" on unsupported findings that he failed to

remediate the domestic violence that led to Kenny's removal. Respondent-father

specifically contests only seven of the trial court's findings of fact. He first challenges

finding of fact 63 to the extent the trial court found he "was not truthful with his

therapists about what brought the juvenile into care or his role in the domestic violence" and his therapist "was unable to provide the proper therapy and tools for him due to him not being truthful or forthcoming." He contends the finding did not accurately reflect his therapist's testimony. Respondent-father also challenges portions findings of fact 40, 62, 64, 71, 72, and 75 to the extent the trial court found he had not demonstrated that he learned from the services in which he participated because he continued to engage in domestic violence. He asserts the only evidentiary basis for findings that he continued to engage in domestic violence were pending criminal domestic violence charges, which he contends did not amount to clear and convincing evidence because the charges had not been adjudicated. Respondent-father argues that absent the findings that he continued to engage in acts of domestic violence, the evidence and findings show that he "exceeded the services required by his case plan" and do not support the determination that neglect was likely to recur if Kenny was returned to his care.

¶ 14 While neither DSS nor the guardian ad litem concede the challenged findings are unsupported by the evidence, both argue the trial court's unchallenged findings fully support its adjudication of neglect as grounds for termination. We agree the unchallenged findings, which "are deemed supported by competent evidence and are binding on appeal[,]" *In re T.N.H.*, 372 N.C. 403, 407 (2019), sufficiently support the trial court's conclusion that there was a likelihood of repetition of neglect without

regard to the challenged findings. Therefore, we need not address or consider the challenged findings. *See id.* ("[W]e review only those findings necessary to support the trial court's determination that grounds existed to terminate respondent's parental rights."); *see also In re A.R.A.*, 373 N.C. 190, 195 (2019) (limiting review to findings necessary to support the adjudication of grounds to terminate parental rights).

¶ 15     In the termination order, the trial court found Kenny had previously been adjudicated neglected due to domestic violence in the home and made unchallenged findings about the "long history of domestic violence which spans across different states" and "created a toxic, dangerous, and injurious environment for [Kenny]." Unchallenged findings describe the domestic violence as "chronic" and document respondent-father's role in the violence. Consistent with the allegations in the underlying juvenile petition and the findings in the prior adjudication order, the court made unchallenged findings about the domestic violence incident in March 2018 that resulted in respondent-father being charged with assault on a female and led to DSS's involvement, including that respondent-father "instructed the [mother] to tell law enforcement that the marks on her body came from [Kenny], who was only four (4) years old at that time"; and about respondent-father's violation of a DVPO and resistance to DSS's efforts to confirm Kenny's wellbeing. The court also found that during a supervised visit with Kenny in July 2018, respondent-father "had to be

removed from [DSS]" after he "became irate with the [s]ocial [w]orker[,]" "was verbally aggressive[,]" and "and displayed a knife during [the] altercation." Furthermore, while respondent-father challenges the trial court's reliance on pending criminal charges as evidence of continued domestic violence, the court made unchallenged findings about the mother's numerous applications for DVPOs against respondent-father due to his threats to do her bodily harm, the most recent of which was filed in October 2019.

¶ 16        We note that it is clear from the evidence and findings that respondent-father did engage in his case plan. The trial court detailed respondent-father's case plan requirements in the termination order and found that he "followed through with the majority of services ordered by the [c]ourt and recommended by [DSS]," including that he "had received counseling services with at least three (3) different therapists since the inception of this case." However, the court additionally found in unchallenged finding of fact 47 that "[w]hile the [parents] have engaged in, as well as continue to engage in, services to address these issues, they have failed to be able to demonstrate an ability to exhibit the methods taught through practical application. As a result, those issues have persisted throughout the duration of both this matter, as well as the underlying matter."

¶ 17        Additional unchallenged findings support the trial court's continued concern about domestic violence. The court specifically found in finding of fact 55 that in

therapy sessions with one therapist, "[r]espondent[-f]ather has consistently denied initiating domestic violence with the [mother], as well as he has denied knowing why the juvenile was placed in the custody of [DSS]"; and the court found in finding of fact 56 that another therapist "was not aware that [respondent-father] was the aggressor based on what [he] reported to her" and therefore "was not providing the necessary course of treatment during their sessions." The trial court also specifically found in findings of fact 59 and 60 that respondent-father diminished developmental concerns displayed by Kenny and

> denie[d] that the domestic violence in his relationship with the [mother] had any affect [sic] on [Kenny] because [Kenny] was in the "toy room" while the [he and the mother] were fighting. . . . Respondent[-f]ather blames the domestic violence on the [mother's] personality defects. . . . There is a deflection of blame on all accounts and a failure by the [r]espondents to take responsibility for the causes that brought the juvenile into care. . . . Domestic [v]iolence has persisted between [them] since at least 2006, yet the [r]espondents insist that they can work together to co-parent.

¶ 18        The trial court specifically related respondent-father's continued denial of the domestic violence, minimization of its impact on Kenny, and refusal to accept any responsibility to the likelihood of repetition of neglect as follows:

> 60. Based on . . . ardent denials of [Kenny's] developmental delays and failure to take responsibility hereto, the [c]ourt finds that the neglect will more than likely repeat itself.
>
> 61. The [r]espondent[-f]ather continues to deny having any issues relating to domestic violence. The [r]espondent[-

f]ather's denial is reason to believe that this issue will continue into the foreseeable future. The issue of domestic violence creates an injurious environment for the juvenile. Thus, it is highly likely that neglect would be repeated if [Kenny] was to be returned to either the [mother] or the [r]espondent[-f]ather's care.

. . . .

65. The [parents'] continued minimization and denial of the domestic violence incidents is of concern with respect to the health and safety of [Kenny] if he was to be returned to either of the [parents]. The failure of the [parents] to acknowledge the severity of their actions, as well as the [mother's] continued failure to follow through with criminal charges against the [r]espondent[-f]ather is significant evidence to this [c]ourt that neither the [mother] nor the [r]espondent[-f]ather have alleviated the conditions that brought [Kenny] into the care of [DSS], and that this pattern would continue if [Kenny] was returned to either of them.

Ultimately, the trial court determined respondent-father had not adequately addressed the domestic violence that led to Kenny's removal and concluded there was a high probability of repetition of neglect if Kenny was returned to respondent-father's care.

¶ 19     Although respondent-father did engage in service of his case plan, "a parent's compliance with his or her case plan does not preclude a finding of neglect." *In re J.J.H.*, 376 N.C. 161, 185 (2020) (citing *In re D.W.P.*, 373 N.C. 327, 339–40 (2020) (noting the respondent's progress in satisfying the requirements of her case plan while upholding the trial court's determination that there was a likelihood that the

neglect would be repeated in the future)); *see also In re Y.Y.E.T.*, 205 N.C. App. 120, 131 (explaining that a "case plan is not just a check list" and that "parents must demonstrate acknowledgment and understanding of why the juvenile entered DSS custody as well as changed behaviors"), *disc. review denied*, 364 N.C. 434 (2010).[4] In *J.J.H.*, this Court upheld the trial court's determination that a repetition of neglect was likely if the children were returned to the respondent's care despite her substantial case plan compliance because the concerns that resulted in the removal of the children continued to exist. *In re J.J.H.*, 376 N.C. at 185–86.

¶ 20         Here, the trial court's unchallenged findings show that while domestic violence was clearly identified as the reason for Kenny's removal and respondent-father engaged in services required by his case plan to address the issue, respondent-father continued to deny his role in the domestic violence, failed to acknowledge the effects the domestic violence had on Kenny, and refused to accept any responsibility for Kenny's removal. The unchallenged findings provide support for the trial court's continued concern that the issue of domestic violence had not been alleviated and support its conclusion that there was a likelihood of repetition of neglect if Kenny was returned to respondent-father's care. *See In re M.A.*, 374 N.C. 865, 874 (2020)

---

[4] The respondent in *In re Y.Y.E.T.* raised his compliance with his case plan as an argument challenging disposition. 205 N.C. App. at 130–31. The trial court addressed the argument but noted "compliance with the case plan is not one of the factors the trial court is to consider in making the best interest determination." *Id.* at 131.

(considering a parent's failure to comprehend and accept responsibility for their role in the domestic violence that plagued the family as supporting the court's determinations that there was a lack of reasonable progress and a likelihood of repetition of neglect); *see also In re L.N.G.*, 377 N.C. 81, 2021-NCSC-29, ¶ 23 (upholding the trial court's determination that there had not been meaningful progress to correct the causes of domestic violence where the parent failed to understand or adequately address the traumatic impact of domestic violence on her children); *In re A.R.A.*, 373 N.C. at 198 (upholding the trial court's determination that there had not been reasonable progress in addressing domestic violence where the parent continued to deny the effects of abuse on children, shifted blame to others, and refused to accept responsibility for the removal of the children).[5]

Accordingly, we hold that the trial court did not err by concluding that there was a likelihood of repetition of neglect and affirm the trial court's determination that respondent-father's parental rights were subject to termination for neglect pursuant to N.C.G.S. § 7B-1111(a)(1).

### III.    Conclusion

Having determined the trial court did not err in adjudicating the existence of

---

[5] Although *L.N.G.* and *A.R.A.* considered the lack of reasonable progress for purposes of termination pursuant to N.C.G.S. § 7B-1111(a)(2), a parent's failure to make progress is also relevant the determination that there is a likelihood of repetition of neglect for termination pursuant to N.C.G.S. § 7B-1111(a)(1). *See In re M.A.*, 374 N.C. at 870; *see also In re R.L.D.*, 375 N.C. at 841 (the court must consider evidence of changed circumstances).

grounds to terminate parental rights, and because respondent-father does not

challenge the trial court's best interests determination, we affirm the trial court's

termination order.

AFFIRMED.